UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Alden T. Greenwood
d/b/a Alden Engineering Company,
        Plaintiff

        v.                                      Civil No. 06-cv-270-SM
                                                Opinion No. 2007 DNH 088
New Hampshire Public Utilities
Commission,
        Defendant

## O R D E R

Alden Greenwood brings this action against the New Hampshire Public Utilities Commission ("PUC") seeking declaratory and injunctive relief.  See generally 28 U.S.C. § 2201.  Greenwood claims that, in contravention of applicable federal law, the PUC rescinded the final ten years of a 30-year rate schedule applicable to three small hydroelectric facilities he owns and operates.  Specifically, he says federal law preempts the field of rate regulation with respect to his generating facilities and precludes the PUC from modifying the rates initially set.  He seeks a judicial declaration that the PUC's purported rescission order was invalid and that his original 30-year rate schedule remains in full force.  He also seeks an injunction preventing the PUC from taking any action inconsistent with the original order approving his 30-year rate schedule.

The parties appear to agree that there are no genuinely disputed material facts and that the resolution of their dispute turns exclusively on questions of law.  Pending before the court are the parties' cross motions for summary judgment.  For the reasons set forth below, Greenwood's motion for summary judgment is granted and the PUC's motion for summary judgment is denied.

## Standard of Review

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

**Background**

I.   <u>Federal Regulatory Scheme</u>.

In 1978, in an effort to encourage the development of alternate energy sources and to reduce the nation's dependance on fossil fuels, Congress enacted the Public Utility Regulatory Policies Act ("PURPA").  Section 210 of PURPA, 16 U.S.C. § 824a-3, directs the Federal Energy Regulatory Commission ("FERC") to promulgate rules to encourage the development of small power production facilities, including regulations requiring public utilities to purchase electricity from qualifying small power facilities (known as "qualifying facilities" or "QFs").  Among other things, PURPA requires that those regulations insure that the rates at which public utilities purchase electricity from qualifying facilities "shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and shall not discriminate against   . . . qualifying small power producers."  16 U.S.C. § 824a-3(b).

A.   <u>Rates of Reimbursement</u>.

The FERC regulations require public utilities to purchase electricity from qualifying facilities at a rate equal to the utilities' avoided cost, unless the state regulatory commission (here, the PUC) determines that a lower rate is in the public

interest, does not discriminate against qualifying facilities, and is sufficient to encourage the construction of small power producers. 18 C.F.R. § 292.304(b)(2). "Avoided cost" is the "cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." 16 U.S.C. § 824a-3(d). In short, it is the amount of money it would have cost the public utility to generate (or purchase from another source) the electricity produced by the small power producer.

The regulations promulgated by FERC also provide that the qualifying facility may elect to have the rate at which it sells electricity to the public utility based on either: (1) the utility's actual avoided costs, calculated at the time of delivery; or (2) the utility's predicted avoided costs at the time of delivery, but calculated at the time the obligation is incurred. 18 C.F.R. § 292.304(d)(2). The regulations go on to provide that if the rates at which a utility must purchase electricity from a qualifying facility are "based upon estimates of avoided costs over the specific term of the contract or other legally enforceable obligation, the rates for such purchases do not violate this subpart if the rates for such purchases differ

4

from [actual] avoided costs at the time of delivery." 18 C.F.R. § 292.304(b)(5).

A plain English translation of those regulations is this: a qualifying facility has the right to receive the benefit of its long term rate schedule even if, due to changed circumstances or even faulty predictions of the utility's future avoided costs, the price at which the utility is obligated to purchase electricity at the time of delivery is unfavorable to the utility (i.e., greater than its actual avoided cost). Moreover, the regulatory and statutory requirement that the rates of reimbursement to qualifying facilities be reasonable, non-discriminatory, and in the public interest, are not violated even if the estimates of the public utility's future avoided costs prove wholly inaccurate. Viewed from a slightly different perspective, neither PURPA nor the FERC regulations provide any basis to rescind or restructure a qualifying facility's existing rate structure simply because the public utility's predicted future avoided costs (which were estimated when the QF obtained its long-term rate schedule) prove to be less than its actual avoided costs over the pertinent time period.

B.    Exemption from Certain State and Federal
      Utility Regulation.

In a further effort to encourage the development of small power producers, PURPA directs FERC to implement regulations exempting qualifying facilities from certain state and federal laws and regulations governing public utilities, including those governing the rates charged by electric utilities.  16 U.S.C. § 824a-3(e).  Accordingly, FERC's regulations provide that a "qualifying facility shall be exempted . . . from State laws or regulations respecting . . . the rates of electric utilities." 18 C.F.R. § 292.602(c)(I).  Consequently, once a state regulatory authority implements FERC's rules governing the purchase of electricity from small power producers, and establishes the rates at which qualifying facilities shall be reimbursed, any subsequent efforts to modify those rates (at least as they apply to qualifying facilities already producing power under established reimbursement schedules) are preempted.  See Smith Cogeneration Mngt. v. Corporation Comm'n & Pub. Serv. Co., 863 P.2d 1227, 1240 (Okla. 1993) ("Reconsideration of long-term contracts with established estimated avoided costs imposes utility-type regulation over QFs.  PURPA and FERC regulations seek to prevent reconsideration of such contracts."); Freehold Cogeneration Assocs. v. Bd. of Regulatory Comm'rs, 44 F.3d 1178, 1192 (3rd Cir. 1995) ("The present attempt to either modify the

[power purchase agreement between the utility and the QF] or revoke [state regulatory] approval is 'utility-type' regulation – exactly the type of regulation from which [the QF] is immune under [16 U.S.C. § 824a-3(e)].").

In other words, once the state regulatory commission establishes a reimbursement rate schedule for qualifying facilities, and once a qualifying facility enters into a contract with the public utility to provide electricity pursuant to that rate schedule, state regulatory commission authority to revisit, amend, or rescind that rate schedule no longer exists. As the New Hampshire Supreme Court recognized, in some cases this might mean that, over time, a utility will become obligated to purchase electricity from a qualifying facility at rates higher than its actual avoided cost. In effect, then, the utility will be subsidizing the qualifying facility at the expense of its ratepayers. Nevertheless, the court correctly noted that FERC had specifically addressed that concern:

> The Commission recognizes this possibility, but is cognizant that in other cases, the required rate will turn out to be lower than the avoided cost at the time of purchase. The Commission does not believe that the reference in the statute to the incremental cost of alternative energy was intended to require a minute-by-minute evaluation of costs which would be checked against rates established in long-term contracts between qualifying facilities and electric utilities.

7

Appeal of Pub. Serv. Co., 130 N.H. 285, 292-93 (1988) (quoting 45
Fed. Reg. 12,224 (1980)).  Moreover, as the United States Supreme
Court observed, while utilities (and their ratepayers) might, in
some circumstances, be forced to pay qualifying utilities more
than their actual avoided cost for electricity, the "ratepayers
and the nation as a whole will benefit from the decreased
reliance on scarce fossil fuels, such as oil and gas, and the
more efficient use of energy."  American Paper Institute v.
American Elec. Power Serv. Corp., 461 U.S. 402, 406 (1983)
(quoting 45 Fed. Reg. 12,214 (1980)).

It may seem odd that rates for electric power paid by
regulated utilities to small power producers are not themselves
subject to ongoing review by state regulatory commissions.  But
Congress had good reasons to exempt qualifying facilities from
state utility-type rate regulation.

Unlike regulated public utilities, small power producers are
not guaranteed a reasonable rate of return on their investment.
A regulated utility, like Public Service Company of New
Hampshire, is entitled to have included in its rate base not only
all legitimate costs incurred in producing (or, as here, in
acquiring) the power it delivers, but also a reasonable profit on

8

its investment.  Small power producers, however, must build
generating plants based upon anticipated revenue streams that are
not subject to adjustment to guarantee recovery of actual costs,
as they may change over time, and a reasonable profit.

Congress thought it important to encourage investment in
small power producing projects, like hydroelectric generation,
and one way to do so was to set firm rates to be paid for power
generated by the small producer over the life of typical
financing arrangements.  Doing so permits an assessment of the
economic viability of such projects at the front end, which, in
turn, facilitates investment in and construction of such plants.

With fixed, long-term rate schedules, those considering
construction of small power production facilities are in a much
better position to accurately determine whether they can be
operated profitably and, therefore, are more likely to obtain the
financing from banks and/or investors necessary to create those
desirable facilities.

> The conferees recognize that cogenerators and small
> power producers are different from electric utilities,
> not being guaranteed a rate of return on their
> activities generally or on the activities vis-a-vis the
> sale of power to the utility and whose risk in
> proceeding forward in the cogeneration or small power

production enterprise is not guaranteed to be
recoverable.

* * *

[C]ogeneration is to be encouraged under this section
and therefore the examination of the level of rates
which should apply to the purchase by the utility of
the cogenerator's or small power producer's power
should not be burdened by the same examination as are
utility rate applications, but rather in a less
burdensome manner.  The establishment of utility type
regulation over them would act as a significant
disincentive to firms interested in cogeneration and
small power production.

American Paper Institute, 461 U.S. 402, 414 (1983) (quoting H.R.

Conf. Rep. No. 95-1750, 95th Cong., 2d Sess. 97-98, U.S.C.C.A.N.

1978, at 7831-7832).


II.   The PUC's Rate Orders and Greenwood's Hydroelectric Plants.

     PURPA requires each state regulatory authority to implement

FERC's avoided cost rules.  16 U.S.C. § 824a-3(f).  Accordingly,

after conducting public hearings on the matter, the PUC entered

an order "updating and establishing the short term and long term

rates to be paid by Public Service of New Hampshire to small

power producers and cogenerators."  Re Small Energy Producers and

Cogenerators (Order no. 17,104), 69 N.H.P.U.C. 352, 353 (July 5,

1984) (the "Generic Rate Order").  Among other things, the

Generic Rate Order permits qualifying facilities to enter into

long-term contracts of five to 30 years.  Id. at 365.  It also

authorizes qualifying facilities to "select as their rates the values shown [in the included table], levelized values for the years of their obligation, or some rate in between, so long as the cumulative net present values, discounted appropriately, do not exceed the values shown in [the table]."[1]

The Generic Rate Order goes on to provide that once a qualifying facility has made a choice of rate plan and has obtained approval for its particular rate schedule, the rate schedule is not subject to change:

> The procedures and the new rates adopted herein will be implemented with the effective date of this Order. . . . It is intended that avoided cost data will be updated annually by the [public utility] and reviewed by the Commission to determine the extent, if any, to which the rates should be revised. With respect to long-term arrangements, any such changes will be applied prospectively only; those [qualifying facilities] with existing long-term arrangements will continue to be governed by those arrangements.

---

[1] That table represents the PUC's best prediction of the avoided cost to produce electricity for each year between 1984 and 2015. A qualifying facility could elect to receive "levelized" rates for the duration of its contract – that is, a fixed rate each year (i.e., the contract price would be "front-loaded" to help the QFs recover initial construction and financing expenses). Alternatively, a QF could elect simply to receive the public utility's predicted avoided cost for each year of its contract, as set forth in the table – rates that would start relatively low in the early years of the contract and escalate as the predicted avoided cost of the utility increased over time.

Id. at 367 (emphasis supplied).  So, just as FERC's regulations
recognize that a utility's actual avoided costs might well differ
from its predicted avoided costs, particularly over a long term,
the Generic Rate Order contemplates that possibility as well.
But, consistent with FERC's regulations, the Generic Rate Order
provides that qualifying facilities with existing contracts will
not have their rates altered simply because of such changes.  See
generally 18 C.F.R. § 292.304(b)(5) ("the rates for such
purchases do not violate this subpart if the rates for such
purchases differ from avoided costs at the time of delivery.").

On August 13, 1985, the PUC approved Greenwood's petition
for a non-levelized 30-year rate schedule (September 13, 1985
through September 13, 2015) for three hydroelectric plants:
Waterloom Falls, Otis Falls, and Chamberlain Falls.  PUC Order
no. 17,814.  Subsequently, Greenwood entered into Interconnection
Agreements with PSNH, pursuant to which PSNH became obligated to
compensate Greenwood for electricity produced by those three
plants at the rate provided in the PUC Generic Rate Order and
Greenwood's approval order (order no. 17,814).  In practice, that
meant PSNH would pay Greenwood approximately $0.06 per kilowatt
hour of electricity generated by each of his three hydroelectric
plants in the first year and that rate would increase each year,

12

culminating in a rate of $0.71 per kilowatt hour in the thirtieth year.[2]

Three years later, however, the PUC had second thoughts about offering small power producers the option to elect unlevelized rates during the final ten years of 30-year contracts.  It seems the PUC realized that its projections about PSNH's long-term avoided costs were likely overstated.  Sarah Voll, the PUC's Chief Economist, wrote a memo to the Commission in which she made the following observations and recommendations:

> One of the areas that the Economics Department would like to clear up . . . is the problem of four projects that have unlevelized rates for the last 10 years of a 30 year rate order.  The Commission denied this type of rate design once we realized the implications (71 cents per KWH by 2015) but never reconsidered those rate orders that had [already] been approved.
>
> We recommend making the adjustment now, when 2006 is still 18 years away and in the context that [small power producers] with long term rate orders of any type are receiving benefits no longer available to [other small power producers].  Action now would also re-emphasize in a somewhat non-controversial way, the Commission's view that we retain authority over rate orders.

---

[2]     PSNH is not a party to this litigation.  It understandably and readily agreed to be bound by any order relating to the rate at which it is obligated to compensate Greenwood for electricity produced at his three hydroelectric plants, since that cost will simply be included in its own rate base.

Administrative Record ("Admin. Rec.") at 82.[3]  In response, in
May of 1988, the PUC rescinded the final ten years of the rate
order applicable to Greenwood's three plants (order no. 17,814).
Re Alden T. Greenwood (Order no. 19,095), 73 N.H.P.U.C. 228 (May
19, 1988).  The PUC reasoned that:

> a rate design incorporating unlevelized 1985 estimates
> of avoided costs for the last ten years of the orders
> was not just and reasonable to the electric consumers
> of the electric utility nor in the public interest as
> required by the rules of the Federal Energy Regulatory
> Commission and by the Public Regulatory Policies Act of
> 1978.

Id. at 228.


It appears the PUC failed to provide Greenwood with notice
of its intention to revisit his previously approved 30-year rate
schedule.  But, when Greenwood eventually learned of the PUC's
rescission order, he moved for reconsideration.  The PUC
scheduled a hearing, at which Greenwood appeared, pro se.  At
that hearing, Greenwood did not challenge the PUC's exercise of

---

[3]     Ms. Voll's suggestion that the PUC "re-emphasize in a
somewhat non-controversial way, the Commission's view that we
retain authority over rate orders," appears to have anticipated
one of the issues presented in this case: whether the PUC does
retain ongoing authority to modify pre-existing long-term rate
orders applicable to qualifying facilities or whether (as
Greenwood suggests) such authority is pre-empted by PURPA and the
implementing FERC regulations.

authority to rescind the last ten years of the rate schedule applicable to his qualifying facilities; in fact, despite federal law to the contrary, he seemed to acquiesce in the PUC's exercise of that claimed authority.  See Testimony of Mr. Greenwood, Admin. Rec. at 139-40.  See also Mr. Greenwood's written submission to the PUC, Admin. Rec. at 102 ("No argument exists to the fact the Commission is within its power to change the rate. Also it most certainly will be to the benefit of future rate payers.").  Greenwood sought only to let the PUC know the substantial economic hardship he would bear if it rescinded the last ten years of his rate order and, if he could not persuade the PUC to revisit that decision, he hoped to find a way to negotiate a new rate for those ten years.  Id. at 140-41.

Following that hearing, the PUC issued order number 19,257, in which it concluded that "Greenwood has presented no fact or argument to cause us to disturb our findings, and that order no. 19,095 is lawful, reasonable and in the public good."  Admin. Rec. at 157.  Accordingly, the PUC let stand its order rescinding the last ten year's of Greenwood's rate order.  Greenwood did not appeal that decision to the New Hampshire Supreme Court.  See N.H. Rev. Stat. Ann. ("RSA") ch. 541:6.

Nearly 17 years later, as the first 20 years of his rate schedule were about to expire (and his plants were about to move into the purportedly rescinded years 21 through 30 of his original rate order), Greenwood filed a petition with the PUC seeking a declaratory ruling that: (1) the PUC's rescission order (number 19,095) violated the provisions of PURPA and the pertinent FERC regulations; and (2) the PUC's original approval of his rate schedule (order number 17,814) remains in full force and effect for its entire 30-year term.   The PUC denied Greenwood's petition, concluding that the doctrine of res judicata prevented him from revisiting the issues the PUC resolved against him nearly 17 years earlier.   Specifically, the PUC concluded:

> In the [prior] order, the Commissioner ruled that, upon reconsideration of 30-year rate orders issued as to both the three [Greenwood] facilities as well as the Lakeport Dam project owned by a different party, the public interest required the Commission to limit the effective period of the previously approved rates to 20 years.
>
> * * *
>
> [Greenwood] appeared at the November 28, 1998 hearing [on his motion for reconsideration] and conceded that the Commission had acted within its authority in issuing the rescission order and did not contest the merits of the order as set forth in Commission staff testimony and the order itself.   The Commission therefore ruled that, notwithstanding the arguments in [Greenwood's] reconsideration motion, the [rescission

order] of the preceding June was lawful, reasonable and
in the public good.

The relief now requested by [Greenwood] is accordingly
barred by the doctrine of res judicata.

Admin rec. at 183, 184-85, <u>Re Alden T. Greenwood (Order no.
24,613)</u>, DE 05-150 (April 13, 2006).


Greenwood moved for reconsideration, asserting that PURPA
and pertinent FERC regulations divested the PUC of authority to
rescind the Generic Rate Order and, therefore, the PUC lacked
jurisdiction to act as it did.  Consequently, said Greenwood, the
PUC's prior decisions were not entitled to any preclusive effect.
The PUC rejected that argument, concluding that Greenwood waived
his right to pursue his claim in federal court and voluntarily
submitted himself to the jurisdiction of the PUC.

Although, as <u>Freehold</u> subsequently made clear,
[Greenwood] could have withheld his acquiescence and
likely argued with success that he had a right to a
federal forum, he also had the right under both state
and federal law to let the Commission proceeding
advance to binding final judgment.  Accordingly,
[Greenwood's] present argument that the Commission
lacked subject matter jurisdiction, rendering its 1988
ruling ineffective, is without merit.

Admin. Rec. at 203, <u>Re Alden T. Greenwood (Order No. 24,638)</u>, DE
05-150 (June 22, 2006).  In response, Greenwood filed this
petition for declaratory and injunctive relief.

17

**Discussion**

The New Hampshire Public Utilities Commission's order rescinding the final ten years of Greenwood's previously-approved rate schedule was, for several reasons, issued in error.  First, as the Commission itself established in the Generic Rate Order, any "changes [to the rate schedule approved in that order] will be applied prospectively only; those [qualifying facilities] with existing long-term arrangements will continue to be governed by those arrangements."  Generic Rate Order, 69 N.H.P.U.C. at 367.

Second, as justification for its rescission order, the Commission concluded that, because it's projections for the public utility's avoided costs were likely inaccurate, Greenwood's rate schedule was "not just and reasonable to the electric consumers of the electric utility nor in the public interest <u>as required by</u> the rules of the Federal Energy Regulatory Commission and by the Public Regulatory Policies Act of 1978."  Order no. 19,095, 73 N.H.P.U.C. at 228 (emphasis supplied).  But, as previously noted, the FERC regulations specifically provide that:

> In the case in which the rates for purchases are based upon estimates of avoided costs over the specific term of the contract or other legally enforceable obligation, the rates for such purchases <u>do</u> <u>not</u> <u>violate</u> <u>this</u> <u>subpart</u> [which requires reimbursement rates to be

18

> reasonable, in the public interest, and non-
> discriminatory toward qualifying facilities] if the
> rates for such purchases differ from avoided costs at
> the time of delivery.

18 C.F.R. § 292.304(b)(5) (emphasis supplied).  In other words,

even if estimates about future avoided costs prove inaccurate,

resulting in higher (or lower) reimbursement rates for QFs than

would otherwise be the case, that discrepancy does not render the

rates paid to the QFs unreasonable, contrary to the public

interest, discriminatory, or violative of PURPA or the

implementing FERC regulations.


      Finally, and perhaps most importantly, PURPA and its

implementing regulations plainly divest the PUC of authority to

amend or rescind a qualifying facility's rate order once it is

approved and in place.  16 U.S.C. § 824a-3(e); 18 C.F.R. §

292.602(c)(I).  See also Freehold, 44 F.3d at 1194; Smith

Cogeneration, 863 P.2d at 1240.  As the PUC itself seems to

concede, it was without legal authority to issue (and enforce)

its order rescinding the last ten years of the rate schedule set

forth in the Generic Rate Order.[4]

---

     [4]     The PUC acknowledges that, "In the Freehold case, the
U.S. Court of Appeals for the Third Circuit determined in 1995
that a state utility regulatory agency could not revisit a
previously approved long term rate determination under PURPA to
reflect changed circumstances.  As noted by Plaintiff in its

Nevertheless, a significant question remains: Whether
Greenwood is precluded from challenging that rescission order
now.  He is not.

I.   Res Judicata.

The PUC asserts that Greenwood's action is barred by the
doctrine of res judicata.  The federal full faith and credit
statute, 28 U.S.C. § 1738, commands federal courts to employ
state res judicata rules when determining the preclusive effect,
if any, to be given to a state court determination.  In Marrese
v. American Academy of Orthopaedic Surgeons, 470 U.S. 373 (1985),
the Supreme Court held:

> The preclusive effect of a state court judgment in a
> subsequent federal lawsuit generally is determined by
> the full faith and credit statute, which provides that
> state judicial proceedings "shall have the same full
> faith and credit in every court within the United
> States . . . as they have by law or usage in the courts
> of such State . . . from which they are taken."  28
> U.S.C. § 1738.  This statute directs a federal court to
> refer to the preclusion law of the state in which
> judgment was rendered.  It has long been established
> that § 1738 does not allow federal courts to employ
> their own rules of res judicata in determining the
> effect of state judgments.  Rather, it goes beyond the
> common law and commands a federal court to accept the

---

original request to the PUC for a declaratory order, the PUC has
acknowledged [in prior orders] the persuasive effect of the
Freehold case."  Defendant's memorandum (document no. 12-2) at 6
n.3.

<div style="margin-left: 2em;">
rules chosen by the State from which the judgment is taken.
</div>

Id. at 380 (citations and internal punctuation omitted).  In New Hampshire, "[t]he essence of the doctrine of res judicata is that a final judgment by a court of competent jurisdiction is conclusive upon the parties in a subsequent litigation involving the same cause of action."  Berthiaume v. McCormack, 153 N.H. 239, 253 (2006) (citing Eastern Marine Constr. Corp. v. First Southern Leasing, 129 N.H. 270, 273 (1987)).  Here, the essential element that is plainly lacking is a "court of competent jurisdiction."

To be sure, both the court of appeals for this circuit and the New Hampshire Supreme Court have recognized that the decisions of administrative agencies are normally entitled to res judicata effect when the agency acted in a judicial capacity. See Aunyx Corp. v. Canon U.S.A., Inc., 978 F.2d 3, 7 (1st Cir. 1992) (citing University of Tennessee v. Elliott, 478 U.S. 788, 797-98 (1986)).  See also Morin v. J.H. Valliere Co., 113 N.H. 431, 434 (1973) ("Res judicata has been applied to a decision of an administrative agency, . . . which is rendered in a judicial capacity and resolves disputed issues properly before it which the parties have had an adequate opportunity to litigate.").

<div style="text-align: center;">21</div>

But, for an administrative agency's decision to have preclusive
effect, the agency must have had the legal authority to render
that decision.  And, as <u>Freehold</u> and <u>Smith Cogeneration</u> make
clear, both PURPA and the FERC regulations divest state
regulatory authorities of the power to amend or rescind a
qualifying facility's rate schedule once it has been approved.

But, says the PUC, while it may have lacked the legal
authority to rescind the final ten years of Greenwood's rate
schedule, the FERC regulations (18 C.F.R. § 292.301(b)(1)) permit
Greenwood to waive his federal statutory rights and consent to
have disputes heard in state court.  The PUC argues that
Greenwood did precisely that – when a "dispute" arose concerning
the PUC's (ultra vires) decision to rescind the final ten years
of the rate schedule, Greenwood voluntarily agreed to resolve it
before the PUC, thereby: (1) vesting the PUC with jurisdiction
over the dispute; and (2) waiving his right to challenge the
PUC's rescission order in federal court.  The court disagrees.

First, nothing in the record suggests that Greenwood (who
was appearing pro se at the time) knowingly waived any rights
conferred upon him by PURPA and its implementing regulations.
Nor would it be appropriate to conclude that he "consented" to

22

have his "dispute" over the PUC's unlawful order resolved by the PUC itself.  As the Supreme Court has observed, "consent [can] not be established by showing no more than acquiescence to a claim of lawful authority."  Schneckloth v. Bustamonte, 412 U.S. 218, 283 (1973) (citation and internal punctuation omitted).

Interestingly, although the PUC gave Greenwood every reason to believe that its authority to rescind the final ten years of his rate schedule was beyond question, the record suggests that the PUC understood that its authority in that realm was, at the very most, questionable.  See, e.g., Voll Memorandum, Admin. Rec. at 82 (urging the PUC to assert, in "somewhat non-controversial way," its erroneous view that it retains rate-making authority over qualified facilities).  And, in an apparent effort to exercise that questionable rate-making authority, the PUC never advised Greenwood that he had the right to challenge the rescission order in federal court.  Given the circumstances, the PUC's assertion that Greenwood "waived" his right to pursue his remedies in federal court and "consented" to the PUC's jurisdiction over those claims is unpersuasive.

Moreover, even though Greenwood might well have had the ability to waive any federal rights granted by PURPA, see

23

Freehold, 44 F.3d at 1187, he could not thereby vest the PUC with authority that was specifically withheld by Congress – that is, the authority to engage in "utility-type" regulation of qualifying facilities including, of course, the authority to amend or rescind their rate schedules.  See 16 U.S.C. § 824a–3(e).  See also 18 C.F.R. § 292.602(c)(I).  Because the PUC was completely without authority to rescind the final ten years of Greenwood's 30-year rate schedule, its decision in that regard is a nullity, and not entitled to preclusive effect.  Greenwood's current claims are not barred by the doctrine of res judicata.  See generally Marrese, 470 U.S. at 382 ("If state preclusion law includes [the] requirement of prior jurisdictional competency, which is generally true, a state judgment will not have claim preclusive effect on a cause of action within the exclusive jurisdiction of the federal courts.") (emphasis in original); Wolf v. Gruntal & Co., 45 F.3d 524, 527 (1st Cir. 1995) ("Res judicata is not implicated if the forum which rendered the prior 'judgment' lacked 'jurisdiction' over the putatively precluded claim.") (parentheticals omitted); Lightsey v. Harding, Dahm & Co., 623 F.2d 1219, 1223 (7th Cir. 1980) ("Since the Commission had no authority to decide the issue that was before the district court, the order of the Commission has no collateral estoppel effect.").

II.   Statute of Limitations.

Next, the PUC asserts that Greenwood's petition for declaratory relief is untimely.  Because the Declaratory Judgment Act sets no limitations period for actions brought pursuant to its provisions, and because PURPA is equally silent on that issue, the PUC points out that this court must adopt the most analogous state limitations period.  And, says the PUC, even employing the most liberal of the arguably applicable state limitations periods – the three year period provided for personal actions under RSA 508:4 – Greenwood's current challenge to the rescission order of 1988 was filed nearly 15 years too late. Again, the court disagrees.

In 1988, the PUC issued order no. 19,095 rescinding the final ten years of Greenwood's previously approved 30-year rate schedule.  That order did not, however, alter Greenwood's rate schedule for the first 20 years.  Greenwood was, then, presented with a choice.  As the PUC has previously acknowledged, he could have immediately challenged the rescission order in federal court.  See Re Alden T. Greenwood (Order no. 24,638), (June 22, 2006) ("as Freehold . . . made clear, Alden [Greenwood] could have withheld his acquiescence and likely argued with success that he had a right to a federal forum.").  In other words,

25

although he would not feel the effect of the PUC's efforts to
rescind a portion of his rate schedule for another 17 years,
Greenwood could have treated the PUC's rescission order as a sort
of anticipatory repudiation of its obligations to him, and
brought suit challenging that decision immediately.

But, on the other hand, because he would not be affected by
the PUC's invalid attempt to rescind the rate order until
September of 2006, Greenwood could have elected to wait until
then to bring suit.  See, e.g., State Employees' Ass'n v. Belknap
County, 122 N.H. 614, 622 (1982) (noting that, consistent with
the doctrine of anticipatory breach, a plaintiff may elect to
bring suit at any time between the other party's repudiation of
its future obligations under the contract and the date on which
that other party actually becomes obligated to perform a specific
duty under the contract).  Because he filed his federal petition
for declaratory and injunctive relief on July 21, 2006 (i.e.,
before the date on which the final ten years of his rate schedule
were to begin) Greenwood's petition is timely, regardless of
which state limitations period applies to this action.

III. <u>Equitable Principles</u>.

Finally, the PUC asserts that the doctrine of laches precludes Greenwood from pursuing his current action.  But, when a claim is brought within the pertinent limitations period, laches imposes a bar only when the plaintiff's delay in bringing suit was unreasonable and the defendant suffered some prejudice. For the reasons set forth above, Greenwood did not act unreasonably in waiting to bring suit until shortly before the PUC's partial rescission order (no. 19,095) would have adversely affected him.  Nor has the PUC demonstrated that it relied to its detriment on the validity of that order or that it has been prejudiced in any way by Greenwood's election to bring suit only recently.  Moreover, for the reasons discussed above, the PUC hardly appears before this court with "clean hands" – a necessary prerequisite to obtaining the type of equitable relief it seeks.

IV.  <u>Greenwood's Requested Relief</u>.

In light of the foregoing, the court concludes that Greenwood's petition for declaratory judgment and injunctive relief is not barred by res judicata, the statute of limitations, or laches.  Consistent with the holdings in <u>Freehold</u> and <u>Smith Cogeneration</u>, <u>supra</u>, the court also concludes that the PUC was without authority to partially rescind Greenwood's 30-year rate

27

schedule.  Once that rate schedule was approved, both PURPA and the enabling regulations enacted by FERC precluded the PUC from exercising that sort of "utility-type regulation" over Greenwood's qualifying facilities.

## Conclusion

The PUC's rescission order of June 30, 1988 (order no. 19,095) was a nullity and had no effect on Greenwood's 30-year rate schedule and the PUC's original approval of his rate schedule (order no. 17,814) remains in full force and effect for its entire 30-year term.  Plaintiff's motion for summary judgment (document no. 11) is, therefore, granted.  Defendant's motion for summary judgment (document no. 12) is denied.

The PUC is hereby enjoined from taking any action that is contrary to the original approval of Greenwood's rate schedule (order no. 17,814) including, but not limited to, attempts to directly or indirectly enforce provisions of the preempted orders (orders no. 19,095; 24,613; and 24,638).

The Clerk of Court shall enter judgment in favor of plaintiff and close the case.

**SO ORDERED.**

_____

Steven J. McAuliffe
Chief Judge

July 19, 2007

cc:  Thomas J. Donovan, Esq.
     Mary E. Maloney, Esq.